MONIQUE C. WINKLER (Cal. Bar No. 213031)
winklerm@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
 pendreyj@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
 katzma@sec.gov
RUTH L. HAWLEY (Cal. Bar No. 253112)
 hawleyr@sec.gov
ERIN E. WILK (Cal. Bar No. 310214)
 wilke@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

    v.

THOR TECHNOLOGIES, INC. and DAVID CHIN,

          Defendants.

Case No.

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      During 2018, Defendant Thor Technologies, Inc. ("Thor"), its CEO and co-founder, Defendant David Chin ("Chin"), and its CTO and co-founder, Matthew Moravec ("Moravec"), conducted an unregistered offer and sale of a crypto asset called a "Thor Token,"

1   raising approximately $2.6 million from approximately 1,600 investors in the United States and

2   abroad.  The Commission has filed a separate action against Moravec.  Thor claimed that it

3   would use the funds to develop a software platform for "gig economy" companies and workers,

4   with features including an instant payment mechanism and pooled health insurance, but the

5   platform was never completed.

6          2.      Thor and Chin offered and sold Thor Tokens to the public through Thor's

7   website, communications in a Telegram channel (a messaging platform), online articles,

8   YouTube videos, and other public appearances.

9          3.      The tokens Thor offered and sold during the offering between March and May of

10  2018, primarily through an initial coin offering ("ICO") to the general public, constituted

11  "securities" under the federal securities laws.  The definition of "securities" includes a range of

12  investment vehicles, including "investment contracts."  Investment contracts are transactions

13  involving the investment of money in a common enterprise with the reasonable expectation of

14  profits to be derived from the entrepreneurial or managerial efforts of others.

15         4.      During the offering, the Thor Tokens had no practical use, as Thor had not

16  developed its software platform.  Thor marketed the Thor Tokens to investors who reasonably

17  viewed the Thor Tokens as an investment vehicle that might appreciate in value based on Thor's

18  and Chin's managerial and entrepreneurial efforts in developing the gig economy software

19  platform.

20         5.      Chin, as the co-founder and CEO of Thor, was a necessary and substantial

21  participant in Thor's securities law violations, and he personally committed these violations.

22         6.      In this action, the Commission seeks injunctions; disgorgement of ill-gotten gains

23  with prejudgment interest; civil monetary penalties; and other appropriate relief.

**JURISDICTION AND VENUE**

24

25         7.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

26  Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)].

27

28

8.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

9.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District.  At the time of such conduct, Defendant Thor's office was in San Francisco, and Defendant Chin resided in San Francisco. Defendants offered and sold the securities from San Francisco, and to purchasers residing in the Northern District of California.

10.     Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County.

**DEFENDANTS**

11.     **Thor Technologies, Inc.** is a California corporation that had its principal place of business in San Francisco, California.  Thor claimed to be developing a software platform for gig economy workers and companies.  The phrase "gig economy" was defined by Thor as the "modern labor market characterized by the prevalence of short-term contracts or freelance work as opposed to permanent jobs."  Thor announced that it closed its business in April 2019, but it has not been dissolved.

12.     **David Chin**, age 64, was last known to be a resident of Grand Junction, Michigan.  During the time of the conduct described in this Complaint, he resided in San Francisco, California.  He was the CEO and co-founder of Thor.

**OTHER RELEVANT INDIVIDUAL**

13.     **Matthew Moravec**, age 32, is a resident of San Francisco, California.  During the time of the conduct described in this Complaint, he was the CTO and co-founder of Thor. He subsequently resigned from the company.

**FACTUAL ALLEGATIONS**

**A.** **The Securities Registration Requirement and the Offering of Thor Tokens**

14.     Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring a company (an issuer) that offers and sells its securities to the investing public, and the persons at the company who direct it, to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

15.     Sections 5(a) and 5(c) of the Securities Act require persons who offer and sell an issuer's securities to the public to register those offers and sales with the SEC, absent certain exemptions that do not apply to Defendants' transactions.  Registration statements relating to an offering of securities provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

16.     Chin and Moravec founded Thor in late 2017.  Thor's business plan, as described in a marketing document, was to create a software platform for gig economy workers and companies.  The platform would use blockchain technology to facilitate instant payments to gig economy workers, and provide those workers with access to benefits, such as retirement and health insurance.

17.     In January 2018, in preparation for the ICO, Thor posted a "white paper"—that is, a paper publicizing the token sale, explaining Thor's planned business, and describing how Thor would use the funds raised from the ICO—to its public website.  Both Chin and Moravec reviewed and approved the white paper.  The white paper stated that Thor planned to issue Thor Tokens "[t]o fund development of this platform and future expansion into related services," and thus "give holders the ability to participate in the optimization of the token's value."  Thor's white paper also stated that "[f]unds from the sale will go towards building out the Thor team, as well as banking acquisitions, marketing, sales, and other business expenses."

18.     Thor's white paper stated that Thor planned to raise $40 million by selling 50 million Thor Tokens.  To incentivize investment, the white paper provided that some early investors would receive a token bonus.  Thor also planned to mint and retain another 50 million tokens that could be used to raise capital in the future, "support the Thor currency market," and compensate employees.

19.     In March 2018, Thor opened a "white list"—that is, a list where individuals from the public could register their interest in purchasing Thor Tokens.  Chin and Thor publicized the white list and the Thor Token sale to investors through Thor's website, press releases issued on Medium, Thor's Telegram channel, and videos publicly available on YouTube.  To solicit investors, Chin and Moravec posted to Thor's Telegram channel and also communicated directly with investors about the sale.  Chin and Moravec further participated in public interviews.

20.     Thor used the NEO blockchain, which is an open-source network that allows developers to create crypto assets and smart contracts, to create the Thor Tokens.  From March 2018 through May 2018, Thor sold Thor Tokens to investors, including in the public initial coin offering and through other direct investments.  From these sales, Thor raised cash and crypto assets worth a total of $2.6 million from a number of investors, including about 200 living in the United States.  The crypto assets received by Thor came from approximately 1,600 distinct public wallet addresses.  Thor distributed Thor Tokens to investors, but retained the majority of the Thor Tokens it had created.

21.     Thor did not take appropriate steps to determine whether the purchasers of the Thor Tokens were accredited investors, and did in fact sell Thor Tokens to unaccredited investors.  "Accredited investors" are, under the controlling regulations, investors who possess certain measures of financial knowledge or sophistication, or meet certain wealth and income thresholds.  These investors are considered to have a greater ability to fend for themselves or sustain the risk of loss of investment when participating in unregistered investment opportunities that do not comply with the rigorous disclosure and procedural requirements of the Securities Act.

22.     Thor pooled the investors' funds from the Thor Token sale.  Thus, each investor stood to share on a pro rata basis in the rise and fall of the value of the tokens.  Thor used the funds in its efforts to develop its platform and business.  However, Thor also paid Moravec $407,103 in crypto assets from the Thor Token sale, to repay him for money that he had loaned to Thor and provide him a substantial return on that loan.  Thor also invested $1,103,359 of the crypto assets from the Thor Token sale into a crypto asset investment fund that Moravec and Chin owned and controlled, in order to diversify the crypto assets.  All but $462,717 of the amount invested with the crypto asset investment fund (which Thor later used on its business) was lost due to a downturn in the crypto asset market.  Finally, Thor paid $104,913 in salary for two individuals who worked for but received no salary from the crypto asset fund, but also provided services for Thor.

23.     Thor was unsuccessful in building its platform and in 2019, Chin announced that Thor was shutting down its business.

**B.     Chin and Thor Marketed the Thor Tokens as an Investment.**

24.     Chin and Thor marketed the Thor Tokens in a manner consistent with an investment, and Thor Token purchasers reasonably viewed the offering as an opportunity to profit, based on the success of Thor's business and the efforts of Thor's management.

25.     Thor marketed the Thor Tokens as an investment that depended on the success of Thor's business.  The white paper stated: "[a]s the network grows, we expect the value of each token to increase as usage of tokens drives demand given their scarcity in a finite pool of available supply."  Network growth, in turn, depended on adoption of Thor's services by gig economy workers.

26.     As explicitly stated in Thor's white paper, the purpose of the ICO was "to fund development of the platform" and thus drive future use and demand for Thor Tokens.  Chin told potential purchasers on Thor's Telegram channel that Thor intended to list Thor Tokens on a digital asset trading platform, which would have allowed token holders the ability to profit from any increased value to the token.  Moravec publicly referred to the token purchasers as "investors" multiple times.

27.     Many token purchasers similarly viewed the Thor Tokens as an investment.  At the time of the Thor Token sales, no development work had yet occurred on the Thor platform, and there was no other place to use Thor Tokens.  Further, most, if not all, of the individuals who bought Thor Tokens did not intend to use the Thor Tokens on Thor's platform.  With the exception of a few Thor employees, the Thor Token purchasers also did not intend to be involved in building Thor's platform or business, and so any profit from their investment would be dependent on the efforts of Thor's management.

**C.     Chin and Thor Failed To Register the Offer and Sale of Thor Tokens with the SEC.**

28.     Thor used interstate commerce for the offer and sale of Thor Tokens by using the internet to, among other things, promote investments in Thor Tokens on its website, the Telegram channel, and interviews that were uploaded to YouTube for dissemination to the public.

29.     Thor never filed a registration statement with the SEC with respect to any Thor Tokens it offered or sold, and no registration statement has ever been in effect with respect to any offers or sales of Thor Tokens.

30.     As a result of Thor's and Chin's failure to register the offering, investors who bought Thor Tokens did not receive the necessary materials containing information about Thor's operations, financial condition, ability to generate profits, or other factors relevant in considering whether to invest in Thor Tokens.  Thor Token investors were also deprived of information about how Thor's executives—namely, Chin and Moravec—would be compensated as a result of the offer and sale of Thor Tokens.  In short, Thor Token purchasers, and the market, lacked required information that issuers provide for registered offers and sales of securities when they solicit public investment.

**CLAIM FOR RELIEF**

*Violations of Sections 5(a) and (5)(c) of the Securities Act*

31.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 30.

32.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus or otherwise, securities as to which no registration statement had been filed.

33.     By reason of the foregoing, Defendants directly or indirectly violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys or other persons in active concert or participation with any of them, from directly or indirectly violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**II.**

Pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], permanently enjoining Defendants, from participating, directly or indirectly, in any crypto asset securities offering; provided however, that such injunction shall not prevent Chin from purchasing or selling securities, including crypto assets, for his own personal accounts.

**III.**

Ordering Defendant Thor to disgorge all ill-gotten gains or unjust enrichment derived from the conduct set forth in this Complaint, together with prejudgment interest thereon.

**IV.**

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

**V.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Granting such other and further relief as this Court may determine to be just and necessary.

Dated:  December 21, 2022          Respectfully submitted,

                                    */s/ Ruth L. Hawley*
                                   Ruth L. Hawley
                                   Erin E. Wilk
                                   Attorneys for Plaintiff
                                   SECURITIES AND EXCHANGE COMMISSION